UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
CASE NO. 3:10-CV-00081-DCR

LEON D. PRUITT and
REBECCA PRUITT, ET AL.                                              PLAINTIFFS

v.

### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SUNBELT RENTALS, INC., ET AL.                                       DEFENDANTS

* * * * *

Comes the Third-Party Plaintiff and Counter Defendant, Sunbelt Rentals, Inc. ("Sunbelt"), by counsel, and hereby offers the following memorandum in support of its motion for summary judgment on its claim for contractual indemnity [1] from Third-Party Defendant and Counter Plaintiff, CJ Mahan Inc. ("Mahan") and its motion for summary judgment on Mahan's Counterclaim.

## I.  INTRODUCTION

In April 2010, Leon Pruitt was injured while using a boom-lift rented which Sunbelt had rented to Pruitt's employer, Mahan, during a bridge-building project. Pruitt and his wife later filed a bodily-injury and product liability action against Sunbelt and the lift's manufacturer, Genie Industries Inc.  While the Pruitts' claims were pending, Sunbelt filed a third-party complaint against Mahan seeking

---

[1]  The present motion does not concern Sunbelt's claim for common law indemnity.  Also, in the event that Sunbelt were to prevail on its motion concerning its contractual-indemnity claim, the issue of damages would be decided separately.

to apportion fault against it and seeking indemnification for any sums which Sunbelt may be required to pay to the Pruitts.[2,3]   Mahan subsequently filed an answer asserting various counterclaims, including breach of contract, wrongful use of civil proceedings, a subrogation claim for workers' compensation benefits, and for a formal declaration that the rental agreement at issue is not an enforceable contract.

Sunbelt now moves for summary judgment on its contractual indemnity claim against Mahan and for summary judgment on all of Mahan's counterclaims. The undisputed material facts show that Mahan formed a valid and enforceable contract with Sunbelt and that Mahan is equitably estopped from disavowing that contract.   Furthermore, under the rental contract's terms, Mahan clearly and unmistakably agreed to indemnify and release Sunbelt from "all liabilities, claims, losses, damages and expenses" arising from Mahan's use of Sunbelt's equipment during the rental period and the breach of the rental agreement. Regardless, however, Mahan's claim for wrongful use of civil proceedings must be dismissed because Sunbelt had probable cause to pursue its third-party complaint against Mahan.   In addition, Mahan's subrogation claim for the payment of workers' compensation benefits to Leon Pruitt must be dismissed

---

[2] Sunbelt's third-party complaint generally seeks indemnification from Mahan.  However, in written discovery, Sunbelt clarified that the indemnity being sought is based on contract and common law. The present motion concerns only Sunbelt's contractual-indemnity claim against Mahan.

[3]  The Pruitts' claims against Sunbelt and Genie have been settled.  Zurich American Insurance Company, the liability insurer for Mahan and Sunbelt, funded the settlement with proceeds from the general liability policy purchased by Mahan.  As explained below, Mahan named Sunbelt as an additional insured on this policy based on the insurance requirements contained in the rental agreement at issue.

because Mahan lacks standing to bring it since Zurich, its workers' compensation carrier, has already intervened in this action to recoup such payments. [4]

Consequently, Sunbelt's motion for partial summary judgment on its claim for contractual indemnity must be GRANTED and its motion for summary judgment on Mahan's counterclaims must be GRANTED.

## II.  STATEMENT OF FACTS

Sunbelt rents construction equipment to customers throughout the U.S.  In August 2009, a Mahan employee named Jeff Pieper called Sunbelt in order to rent an 80-foot boom lift for use in a bridge project in Gratz, Kentucky. (Exh. 1: Pieper's Depo, pp. 22, 91).  Pieper, as Mahan's superintendent, had authority to rent such equipment on behalf of Mahan. (Pieper's Depo, p. 149).  After receiving Pieper's request, Sunbelt prepared a reservation form identifying the rental equipment, the customer, the dates of rental, the amount to be charged, and other terms and conditions. (Exh. 2: August 12, 2009 Reservation Form).  The form identified "CJ Mahan Construction Co" of Grove City, Ohio as the customer.

On August 14, 2009, Sunbelt's employee Gary Travis delivered the lift to Mahan's construction site. (Exh. 3: Travis's Depo, p. 20).  After unloading the equipment, he spoke with Mahan's employee Kevin Lape. (Id., p. 26).  Lape recalled Travis asking for someone from Mahan to sign for the equipment. (Exh. 4: Lape's Depo, p. 16).  Lape told Travis he was employed by Mahan and could sign for it. (Id.).  Travis then gave Lape a copy of the rental-out agreement

---

[4] As will be demonstrated in a separate dispositive motion targeting Zurich's Intervening Complaint, Zurich's lien has been extinguished because its payments on behalf of Leon Pruitt do not exceed the amount of the Pruitts' attorney fees and expenses in this action.

("Contract") and the reservation form which had been stapled to it. (Travis's Depo, p. 19).  Travis told Lape that additional terms and conditions were printed on the back. (Travis's Depo, p. 29).  When asked if Lape had been given the opportunity to read the Contract, Travis responded, "He had all day to read it." (Travis's Depo, pp. 29-30).  Lape then printed and signed his name on the Contract. (Exh. 5: Contract, pp. 1-4; Lape's Depo, pp.14-15).  He did not read the Contract before signing it. (Lape's Depo, p. 19).  Shortly thereafter, Lape gave the Contract to Pieper, who was Mahan's superintendent on the job. (Lape's Depo, p. 19).

Lape testified that he had never been told by anyone at Mahan that he could not sign for equipment after it had been delivered to a construction site. (Lape's Depo, p. 18).   Pieper testified that anyone employed by Mahan is authorized to sign rental documents when such equipment is delivered. (Pieper's Depo., p. 68).

The following text appeared above Lape's signature in bold print: "**Customer has received, read, understands, and agrees to the estimated charges herein and all the terms and conditions of this Contract, including the Release and Indemnification provision in Section 8.**" (Contract, p. 3). When asked if there was any text on the reverse side of the page he had signed, Lape did not have a specific recollection but said "If that's what I signed, I'm sure it was." (Lape's Depo, p. 20).

On the back side of document Lape signed are "Additional Terms and Conditions" including insurance, release, and indemnification provisions. (Contract, p. 4).  The identical terms and conditions were printed on the back of

the first page in the Contract. (Contract, p. 2).  The Release and Indemnification

provision in Section 8 states as follows:

> **Release and indemnification.  To the fullest extent permitted by law, [Mahan] indemnifies, releases, holds Sunbelt harmless** and, at Sunbelt's request, defends, with counsel approved by Sunbelt, **from and against all liabilities, claims, losses, damages and expenses**, including attorneys' fees and expenses, **however arising** or incurred, **related to any** incident, any damage to property, **injury to, or death of, any person … caused by or connected with the use, possession or control of the equipment during the rental period** or breach of this contract, **whether or not caused by the active or passive negligence or other fault of any party indemnified herein** and any of the foregoing arising or imposed in accordance with the doctrine of strict or absolute liability.  Customer's indemnity obligations shall survive the expiration or termination of this contract.  If any part of this action is determined invalid by a court of competent jurisdiction, customer agrees that this release and indemnification shall be enforceable to the fullest extent permitted by law.

(Contract, pp. 2 and 4) (emphasis added).

Section 9 entitled "Insurance" requires the customer to purchase general liability

insurance which shall be primary and which has an occurrence limit of at least

$1,000,000. (Id.).   The insurance policy must name Sunbelt as an additional

insured, and the customer must provide Sunbelt with certificates showing that the

requisite insurance coverage was purchased. (Id.).

Hope Matheny, Mahan's corporate designee, testified that no one from

Mahan ever contacted Sunbelt at any time to object to the terms and conditions

of the Contract. (Exh. 6: Matheny's Depo, Aug. 27, 2012, p. 46).  This was true

even though Pieper, who had received a copy of the Contract, had sent it to the

company's headquarters after Lape had given it to him. (Pieper's Depo, pp. 145-

46).  When asked why no objection was made, Matheny explained that "We did

not have to initiate any conversation to object to anything because this was not a contract that we were bound by." (Id., p. 43).  She also confirmed that in June 2009, Mahan had purchased a $1,000,000 general liability insurance policy from Zurich American Insurance Company naming Sunbelt as an additional insured. (Matheny's Depo, Aug. 27, 2012, pp. 73-75, 83; Exh. 7: Certificate of Insurance).[5]  Mahan and its counsel stipulated that Mahan's employees used the lift from August 14, 2009 through the date of the subject accident, April 22, 2010. (Matheny's Depo, Aug. 27, 2012, p. 118).  Matheny testified that Mahan also paid all of Sunbelt's invoices for the boom lift during that period. (Exh. 8: Matheny's Depo, April 30, 2012, pp. 67-68, 102; Exh. 9: Invoices for Boom Lift).[6]

Most tellingly, Matheny confirmed that Mahan had rented or purchased equipment from Sunbelt on at least 16 other occasions. (Matheny's Depo, April 30, 2012, pp. 67-68, 102).  She even produced copies of other rental and sales contracts with Sunbelt dating from March 2006 through September 2010 -- three of which occurred after the subject accident on April 22, 2010. (See Matheny's Depo, April 30, 2012, Exhs. 12 through 21).  "CJ Mahan Construction Co" in

---

[5]  Based on this certificate of insurance and the language of the contract at issue, Sunbelt tendered its defense in this action to Mahan in January 2011. (Exh. 10: January 19, 2011 Tender Letter).  Zurich later accepted Sunbelt's tender on behalf of its named insured, Mahan. (Exh. 11: May 6, 2011 Letter Accepting Tender).  Initially, Zurich's acceptance of Sunbelt's tender was without reservation of any rights to contest coverage under the applicable policy.  Consequently, Zurich retained one of its panel attorneys, David Clark, to defend Sunbelt at Zurich's expense.  However, in November 2011, Zurich notified Sunbelt that it was defending Sunbelt against Mahan's counterclaims under reservation (Exh. 12: December 9, 2011 Reservation Letter).  This ROR letter prompted Sunbelt to hire separate counsel to defend Mahan's counterclaims.  Sunbelt now seeks to recover the costs it has incurred in defending those claims.

[6]  Although the Contract states that the rental period was estimated to run through September 11, 2009, it is undisputed that Mahan was renting the subject lift up to and through the date of the accident.  This is consistent with the Contract's definition of "rental period" which begins when the equipment is delivered to the customer and ends when the equipment is returned to the store during normal business hours." (Contract, pp. 2 and 4, section 11).

Grove City, Ohio is listed as the customer on all of the contracts.  Like the Contract at issue, each agreement is double-sided and contains similar – if not identical -- insurance, release, and indemnification provisions.  Those appear on the back sides of the contracts, just as they did in the Contract at issue.

When asked whether Mahan had ever contacted Sunbelt to object to the terms and conditions of the other rental and sales contracts, Matheny replied that Mahan __did not__ because, again, Mahan did not believe the agreements constituted enforceable contracts. (Matheny's Depo, April 30, 2012, pp. 69, 70, 72, 74, 77-79, 81, 85, 86).   However, she did concede that Mahan had purchased general liability insurance naming Sunbelt and Sunbelt's predecessor in interest, Nationsrent, as additional insureds when the prior contracts were in force. (Matheny's Depo, Aug. 27, 2012, pp. 95-97; Exhs. 3-5).

Additional facts are developed in the Analysis section below.


### III.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that judgment for the moving party is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See also Browning v. Dep't of Army, 436 F .3d 692, 695 (6th Cir. 2006). While all inferences are drawn in favor of the nonmoving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary

judgment. See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986) (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); Celotex Corp. v. Catrett, 477 U.S. 317, 324-325 (1986). Stated alternatively, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

A.   SUNBELT IS ENTITLED TO SUMMARY JUDGMENT ON ITS CONTRACTUAL INDEMNITY CLAIM BECAUSE THE RENTAL CONTRACT WITH MAHAN IS VALID AND ENFORCEABLE UNDER KENTUCKY LAW

Mahan contends that the Contract which Lape signed is not enforceable for various reasons.  First, it argues that the Contract is not enforceable because Lape was not authorized to bind Mahan to it.  Second, Mahan asserts that even if Lape had bound it, the indemnification provision is invalid because the language incorporating that provision by reference was not conspicuous enough to be effective.  Third, Mahan contends that the Contract's indemnification provision is otherwise void under the Kentucky's Workers' Compensation Act (KRS 342.690), Kentucky's statute on construction services contracts (KRS 371.180), and the Statute of Frauds (KRS 355.2A-201).[7]

---

[7]  Mahan assumes that Kentucky law governs the Contract even though the agreement states it will be governed by the law of North Carolina without regard to conflicts of law principles (Contract, p. H, Sec. 20).  Nonetheless, Sunbelt concedes that Kentucky law applies.

All of these arguments are unpersuasive.  First, Mahan is bound to the Contract because Lape's supervisor, Pieper, and Lape himself were Mahan's apparent agents for the purpose of binding Mahan to rental agreements.  Second, Mahan is equitably estopped from disavowing the Contract because it never informed Sunbelt after the fact that Pieper and Lape were not permitted to bind the company to rental agreements even though Pieper had sent a copy of the Contract to Mahan's corporate headquarters shortly after it was signed.  Third, the language above Lape's signature was plain and clear so that Lape and Mahan were placed on notice that the indemnity provision on the reverse side of the document was part of the Contract.  Finally, the Contract's indemnity provision is not barred by the Kentucky's Workers' Compensation Act, Kentucky's statute governing construction services contracts, or the Statute of Frauds.

### 1.  Pieper and Lape Were Mahan's Apparent Agents

Mahan contends that Pieper and Lape were not authorized to bind the company to the Contract because Mahan's officers or corporate counsel are the only persons authorized to do so. (Matheny's Depo, Aug. 27, 2012, p. 119).  In the absence of specific authorization from the corporation's counsel or officers, Mahan contends that it is not bound by the terms of any rental agreement – even when its own employees have signed "to receive delivery" of the rental equipment, the employees then use that equipment, and Mahan pays for such use. (Matheny's Depo, Aug. 27, 2012, pp. 17, 53).  This tortured argument must

be rejected because the actions of Mahan's employees clearly fall within the apparent scope of their authority.   Consequently, Mahan is bound by the Contract at issue.

Under Kentucky law, the party alleging agency and resulting authority has the burden of proving that it exists. Lacy v. Hodgkin, 122 S.W.2d 768 (Ky.App. 1938).  Agency can be established by circumstantial evidence including the acts of the parties, such as the continuous course of conduct between them covering a number of successive transactions. Monohan v. Grayson County Supply Co., 54 S.W.2d 311 (Ky.App. 1932); Wedding v. Duncan, 220 S.W.2d 564 (Ky.App. 1949).  Examining a party's past conduct helps determine whether the party's agent had authority to engage in the transaction at issue. Aeroplane Oil & Refining Co. v. Disch, 262 S.W. 939 (Ky.App. 1924).  "A principal is bound by the contract of his agent within the scope of the latter's apparent authority although not authorized in expressed terms." Tennessee Gas & Transmission Co. v. Cooke, 206 S.W.2d 491, 494 (Ky.App. 1947).  It is equally true that "a principal is bound by the acts of the agent within the apparent scope of authority although the authority may be in fact limited, if one dealing with the agent is ignorant of limitations upon his authority." Id.

When applying these principles of law to the undisputed facts, the only reasonable inference to be drawn from Mahan's course of conduct with Sunbelt is that Mahan's employees were acting within their apparent authority when ordering equipment from Sunbelt and signing the rental agreement at issue. Consequently, Mahan is bound by the Contract.  Mahan, through its corporate

designee, has admitted that it has rented equipment from Sunbelt as far back as 2006.  It has produced copies of numerous other rental agreements which contain similar – if not identical -- release, insurance, and indemnity provisions.[8] Like the Contract at issue, those provisions appear on the reverse sides of the agreements' pages (a feature which cannot be illustrated when filing documents electronically with federal courts).  Mahan has also conceded that its employees, particularly superintendents for various construction projects, are permitted to rent construction equipment from companies like Sunbelt and to sign (or direct others to sign) for "the receipt of delivery" of such equipment.  Mahan employees then use the equipment, and Mahan's corporate office pays the rental invoices. Mahan also purchased general liability insurance naming Sunbelt as an additional insured on at least two occasions before the subject accident. (Matheny's Depo, Aug. 27, 2012, pp. 93-96).  Although Mahan has a policy that only its corporate counsel or officers may bind the company to a contract, Mahan has admitted it <u>never told Sunbelt</u> about this policy or about any limitations on the authority of Mahan's employees. (Matheny's Depo, Aug. 27, 2012, pp. 119-20).

Under these circumstances, Lape's signature on the Contract binds Mahan to all terms and conditions in the agreement, including the release, insurance, and indemnity provisions.  Although Lape has testified that he was never specifically authorized by anyone from Mahan to sign rental agreements,

---

[8]  The rental agreements which Mahan's employees signed in 2009 and 2008 contain language stating: "All of the terms herein are incorporated into all future contracts between Sunbelt and Customer upon Customer's use of Sunbelt's equipment under those contracts, without objection, unless subsequently modified in writing by Sunbelt." See generally, Exh. 12 to Matheny's Depo, April 30, 2012, p. 2, paragraph 1.  Because Mahan has conceded that its employees used the subject lift, starting in August 2009, without objection, it has waived any argument regarding the enforceability of the Contract.

this fact does not matter because, under Tennessee Gas, Mahan is still bound. This is true even though Sunbelt was ignorant of the alleged limitations on Lape's authority. See also Thompson v. The Budd Co., 199 F.3d 799, 810 (6th Cir. 1999) ("In every alleged contract between Merrick and Budd … the indemnity provision is on the reverse side of the purchase order. Merrick has acknowledged that indemnity provisions of some sort were included in past contracts. Thus, Merrick cannot now claim that it was unaware that the provisions on the reverse side of the purchase order were part of the contract.")

### 2. Mahan is Equitably Estopped from Disavowing the Contract

Under Kentucky law, a party may be equitably estopped from disavowing a contract under certain circumstances. In Ping v. Beverly Enterprises, Inc., -- S.W.3d --, the Kentucky Supreme Court adopted the Restatement (Third) of Agency, § 2.05 which identifies these circumstances. According to the Restatement,

> [A] principal may be estopped from disavowing an agent's unauthorized transaction with a third party only if the third party justifiably was induced to make a detrimental change in position because it believed the agent had authority and then only if "(1) the [principal] intentionally or carelessly caused such belief, or (2) having notice of such belief and that it might induce others to change their positions, the [principal] did not take reasonable steps to notify them of the facts.

Ping v. Beverly Enterprises, Inc., 2010-SC-000558-DG, 2012 WL 3631399 (Finality, Ky. Sep. 13, 2012).

Here, the undisputed facts trigger this principle. Based on the course of conduct between them, Sunbelt reasonably believed that Mahan employees

were authorized to rent equipment from Sunbelt and sign enforceable contracts memorializing the rentals.  Furthermore, based on this belief, Sunbelt changed its position by furnishing the equipment to Mahan.  This change in position has been detrimental to Sunbelt because Mahan now disavows the Contract, meaning that Mahan is now taking the position that it is not required to indemnify Sunbelt for losses arising from the equipment's use and is not required to provide general liability insurance naming Sunbelt as an additional insured.  Mahan's current posture has exposed Sunbelt to risks which the release, insurance, and indemnity provisions in the Contract were designed to prevent.  Even though Mahan had to know that Sunbelt believed that Mahan's employees who signed the rental agreements were authorized to do so, Mahan never informed Sunbelt of any limitations on the signing employees' authority.  Mahan's failure to take any reasonable steps to notify Sunbelt of these alleged limitations precludes it from seeking to avoid its obligations under the Contract.

### 3.  The Indemnity Language was Clearly Incorporated by Reference

Mahan next argues that the language above Lape's signature was not effective to incorporate the indemnity provision on the reverse side of each page because KRS 446.060 requires all text to appear before Lape's signature and because the incorporating text was "not in bold, all capital letters, larger, or other contrasting type or color that differentiates the writing from the other sections." (DN 43, Amended Answer and Counterclaim, paragraphs 37 and 40).  Both arguments are unpersuasive for several reasons.

First, the Contract which Lape signed contained two pages, with each page having text on the front and back (e.g. four pages total). The section entitled "Additional Terms and Conditions" was contained on the back of each page (e.g, pages 2 and 4). Therefore, in a literal sense, the indemnity clause appeared <u>before</u> Lape's signature -- on the back of the first page.

Second, although <u>KRS 446.060</u> generally states that writings which must be signed in order to be effective must be signed "at the end or close of the writing," Kentucky courts have held that this statute does not abolish the doctrine of incorporation by reference. <u>Bartelt Aviation, Inc. v. Dry Lake Coal Co., Inc.</u>, 682 S.W.2d 796, 797 (Ky. App. 1985). "[W]hen a signature is placed after clear language has expressed the incorporation of other terms and conditions by reference, it is a logical inference that the signer agrees to be bound by everything incorporated." <u>Id</u>. Therefore, even if the indemnity clause had appeared for the first time <u>after</u> Lape's signature, the indemnity language would not necessarily be rendered ineffective.

Finally, Kentucky law does not require the text above Lape's signature to appear "in bold text or any unusual form." <u>Bartelt Aviation, Inc. v. Dry Lake Coal Co., Inc.</u>, 682 S.W.2d 796, 797 (Ky. App. 1985). Instead, the only requirement is that the incorporating language be plain and clear such that a reasonable person would have been aware of the language to be incorporated under the circumstances. <u>Home Lumber Co. v. Appalachian Reg'l Hospitals, Inc.</u>, 722 S.W.2d 912, 915 (Ky.App. 1987).

Mahan suggests that the absence of any language above Lape's signature referring the reader to the reverse side of the page would not have placed a reasonable person on notice of the indemnity clause.  However, Mahan has rented from Sunbelt on at least 16 other occasions, with most of those rentals coming before the subject lift was leased.  Mahan, through its employees, had signed multiple prior rental agreements with insurance and indemnity provisions on the reverse sides of their pages – just like the Contract at issue.  Mahan cannot now be heard to complain that it was unaware of the indemnity clause on the reverse side of the Contract.  See Thompson v. The Budd Co., 199 F.3d 799, 810 (6th Cir. 1999) (applying Kentucky law and holding that company bound by indemnity clause on reverse side of purchase order which company's employee had signed).

### 4.  KRS 342.690 Does Not Immunize Mahan from its Own Bargain

Mahan also contends that KRS 342.690 immunizes it from Sunbelt's contractual-indemnity claim because employers, like Mahan, which have provided workers' compensation benefits to an employee (who subsequently files a tort action against a third party) cannot be compelled to pay anything more than what they already have provided to the employee.  However, this argument conflicts with the statute's plain language and the cases interpreting it.  Although it is true that KRS 342.690 generally limits an employer's liability to others (who may be liable for the employee's injuries in tort) to the amount of workers' compensation which the employer has paid the employee, the statute contains

an exception where the employer has formed a written agreement with a third party requiring liability to be shared differently.

> The liability of an employer to another person who may be liable for or who has paid damages on account of injury or death of an employee of such employer arising out of and in the course of employment and caused by a breach of any duty or obligation owed by such employer to such other shall be limited to the amount of compensation and other benefits for which such employer is liable under this chapter on account of such injury or death, **unless such other and the employer by written contract have agreed to share liability in a different manner**.

> KRS 342.690(1) (emphasis added).

The Kentucky Supreme Court has interpreted this statute to mean that an employer's written indemnity agreement with a third party does not violate KRS Chapter 342. "KRS 342.690(1) clearly permits employers … to agree to share an employer's liability for damages in a manner different from that set forth in the statute, provided they do so by written contract. Thus, we are not convinced that a contractual indemnity provision must be viewed as being abhorrent to Chapter 342." Labor Ready, Inc. v. Johnston, 289 S.W.3d 200, 208 (Ky. 2009).

Because Mahan formed a written indemnity agreement with Sunbelt that falls outside of Kentucky's Workers' Compensation Act, Mahan is not immune from Sunbelt's contractual-indemnity claim.

### 5.  The Rental Agreement is not a "Construction Services Contract"

Under Kentucky law, any provision in a "construction services contract" purporting to indemnify a contractor from that contractor's own negligence is void and unenforceable.  KRS 371.180(2).  The statute defines such contracts as "any

16

contract or agreement relating to the construction, alteration, repair … or maintenance of any building, highway, road, railroad, excavation or other structure … or any contract or agreement relating to the planning, design, administration or other professional and technical support services" rendered in connection with construction services. KRS 371.180(1).   Mahan contends that the Contract falls within the statutory definition of a construction services contract, rendering the Contract's indemnity provision invalid.   However, the agreement at issue clearly involves the leasing of equipment to Mahan – not the performance of construction services.   (Mahan has already conceded this point by referring to the relationship between Sunbelt and Mahan as one of lessor and lessee.   See Mahan's Amended Answer and Counterclaim, DN 43, p. 7, paragraph 12).   Although Mahan ended up using the rental equipment to perform construction services for others, this circumstance does not convert the Contract into a construction services agreement.   Moreover, under the statute's plain language, Sunbelt's leasing of the lift does not constitute "planning, design, administration or other professional and technical support services" that would invalidate the Contract's indemnity provision.   Furthermore, Sunbelt is neither a "contractor" nor is it an entity providing "construction services" because it is merely a lessor that is renting a good to Mahan.   Therefore, this statute simply does not apply to Sunbelt.

### 6.  The Contract Complies with 355.2A-201

The Uniform Commercial Code applies to equipment leases in Kentucky. Hertz Commercial Leasing Corp. v. Joseph, 641 S.W.2d 753, 757 (Ky.App. 1982).  Kentucky's version of the UCC contains its own Statute of Frauds. See KRS 355A.201.  Under that statute, a lease contract is not enforceable by way of action unless "there is a writing, signed by the party against whom enforcement is sought or by that party's authorized agent, sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term."  Here, the Contract meets all of these requirements.  The agreement identifies the goods being leased (e.g. the boom lift), the applicable fees, and the lease term (e.g. the "rental period").  Also, as demonstrated earlier, Lape signed the agreement as Mahan's apparent agent which bound Mahan to the Contract.  Consequently, the Contract complies with KRS 355A.201.


B.   BECAUSE THE CONTRACT IS ENFORCEABLE, MAHAN'S COUNTERCLAIMS MUST BE DISMISSED.

Under Kentucky law, Sunbelt's Contract with Mahan is valid and enforceable.  Therefore, Mahan is not entitled to declaratory relief stating otherwise.  Furthermore, under the Contract, Mahan has released all claims against Sunbelt arising from the use of the lift or the breach of the rental agreement.  Based on the signature of its apparent agent, Kevin Lape, Mahan has waived any claims against Sunbelt for breach of the rental agreement, wrongful use of civil proceedings, and for payment of workers' compensation

benefits.   In the absence of the Contract's language concerning waiver and release, however, there are independent and alternative grounds to dismiss Mahan's wrongful use and workers' compensation subrogation claims.

### 1.  Sunbelt Had Probable Cause to Pursue Its Third-Party Complaint

Under Kentucky law, one is liable for the wrongful use of civil proceedings when a civil proceeding against another is initiated without probable cause and for an improper purpose, and the proceeding has terminated in favor of the person against whom it was brought. Mapother & Mapother, P.S.C. v. Douglas, 750 S.W.2d 430, 431 (Ky. 1988).  "Improper purpose" is defined as a "purpose other than that of a proper adjudication of the prior claim." Bates v. Curtis, -- S.W.3d -- (Ky.App. 2012), citing Prewitt v. Sexton, 777 S.W.2d 891 (Ky. 1989). The Court determines as a matter of law whether a litigant had probable cause for the prior action.  D'Angelo v. Mussler, 290 S.W.3d 75, 80 (Ky. App. 2009). "Probable cause" must be determined "in light of those facts that the accuser knows or reasonably believes to exist at the time when he acts." Id., citing Restatement (Second) of Torts, § 662(c).

In the present case, the proceeding which Mahan accuses Sunbelt of improperly initiating obviously has not yet concluded.  Nevertheless, regardless of the ultimate disposition of Sunbelt's third-party claims, Mahan's claim for wrongful use of civil proceedings must be dismissed as a matter of law because Sunbelt had probable cause to assert those claims against Mahan.

When Sunbelt filed its third-party complaint in June 2011, it asserted claims for indemnification and apportionment of fault against Mahan. When filing the pleading, Sunbelt possessed an August 2009 rental agreement (the "Contract") signed by Mahan's then-employee, Lape, which contained insurance and indemnification requirements inuring to Sunbelt's benefit. Sunbelt also possessed a certificate of insurance naming it as an additional insured under Mahan's general liability policy and a letter from Zurich confirming that Sunbelt was an insured under that policy because of the valid lease agreement between Sunbelt and Mahan. Under these circumstances, the claim for indemnification was asserted.

Sunbelt, through counsel retained by Zurich, also believed that a claim for apportionment of fault against Mahan should be asserted in order to preserve Sunbelt's right to seek to apportion fault against Mahan at a trial of the Pruitts' claims. In order to preserve this right, a party is required to make "an active assertion of a claim" against a nonparty whose alleged negligence caused or contributed to the plaintiff's injuries and damages. Floyd v. Carlisle Construction Co., 758 S.W.2d 430, 432 (Ky. 1988). By impleading Mahan as a third-party defendant, Sunbelt ensured that Mahan was a "party" under KRS 411.182 against whom apportionment could be sought. This method of impleading nonparties by asserting claims for indemnity and apportionment has been recognized in the Western and Eastern Districts as an acceptable practice for preserving a party's right to seek an apportionment of fault. See Gaskin v. Moore, 2011 WL 2935041 (W.D. Ky. July 18, 2011) ("Honeywell filed a third-party

20

complaint against Wells and Paul's Fruit Market asserting claims for "indemnity, apportionment, and contribution" and essentially preserving its right to an apportionment instruction); and In re Air Crash at Lexington, Ky., August 27, 2006, 2007 WL 2915187 (E.D. Ky. Oct. 5, 2007) (allowing filing of third party complaint as means for preserving right to seek apportionment of fault of third-party defendants at trial).

Nonetheless, Mahan contends that Sunbelt's claim for apportionment was frivolous because Mahan was immune from tort liability for the Pruitts' claims under Kentucky's Workers' Compensation Act and because Sunbelt lacked any factual basis on which to assert that Mahan bore fault for Leon Pruitt's injuries. Both arguments are unavailing for several reasons.

First, as explained earlier in this memorandum, although Kentucky law renders Mahan immune from tort liability to the Pruitts based on its payment of workers' compensation to Leon Pruitt, Mahan's Contract with Sunbelt – particularly the indemnity provision – is not governed by the Act because Mahan voluntarily chose to share its liability to others in a different manner.   KRS 342.690.

Second, even though an employer may otherwise be immune from liability to an employee under the Act, Kentucky law still permits the employer to be impleaded into actions filed by the employee against third-party tortfeasors so that fault can be apportioned against the third party and the employer.  Dix & Associates Pipeline Contractors, Inc. v. Key, 799 S.W.2d 24, 29 (Ky. 1990).  This case falls squarely within that holding since Sunbelt, as a third party, sought to

implead Mahan, as Leon Pruitt's employer, so that fault could be apportioned against Mahan at trial.

Finally, when filing its third-party complaint, Sunbelt reasonably believed that Mahan employees had prevented one of Sunbelt's employees from placing new warning decals on the subject lift shortly before Mr. Pruitt's accident.  One of the factual allegations in the Pruitt's complaint is that Sunbelt negligently failed to warn the ultimate users of the lift about a known hazard involving the lift's failure to brake properly on slopes under certain conditions. (DN 1, <u>Complaint</u>, Count Four).  The hazard was the subject of a safety campaign created by the lift's manufacturer, Genie, under which distributors, such as Sunbelt, were required to disseminate safety bulletins to customers and apply new decals to the affected machines.  Sunbelt's employee John Giovenco testified that he attempted to apply new decals to the subject lift, as required by the safety campaign, before the accident but that unidentified employees of Mahan had prevented him from installing all of the new decals. (<u>Exh. 13</u>: Giovenco's Depo, pp. 23-24).  Based on this information, Sunbelt pursued an apportionment of fault against Mahan and even summarized Giovenco's allegations in the body of the third-party complaint.

Under these circumstances, Sunbelt clearly had probable cause to bring its third-party complaint against Mahan.  Consequently, Mahan's claim for wrongful use of civil proceedings must be dismissed.

### 2.  Mahan Lacks Standing to Pursue the WC Subrogation Claim

It is undisputed that Zurich was Mahan's workers' compensation carrier when the subject accident happened.   In January 2012, Zurich filed its Intervening Complaint seeking reimbursement from Genie and Sunbelt for the workers' compensation benefits provided to Mr. Pruitt since the accident (DN 52). Both Genie and Sunbelt are filing a joint summary-judgment motion seeking the dismissal of Zurich's subrogation claim.   Sunbelt incorporates by reference the arguments contained in that motion.   Because the Pruitts' attorney fees and costs in pursuing their claims against Sunbelt and Genie have exceeded the amount of Zurich's subrogation lien to date, the right to subrogation is extinguished under Kentucky law. See KRS 342.700(1) and AIK Selective Self-Insurance Fund v. Minton, 192 S.W.3d 415 (Ky. 2006).   Regardless, however, Mahan lacks standing to pursue a subrogation claim for the payment of workers' compensation to Mr. Pruitt because such compensation was provided by Mahan's insurer, Zurich, which has already intervened in this matter. Consequently, Mahan's subrogation claim must be dismissed as a matter of law.

### V.  CONCLUSION

Mahan employees have signed numerous rental agreements with Sunbelt over the years.  All such agreements have contained indemnity provisions on the reverse sides of their pages.   After signing them, Mahan employees used the equipment and later returned it.  Sunbelt billed Mahan for such rentals, and Mahan paid the bills.   Now, Mahan takes the extraordinary position that its

employees were not authorized to bind Mahan to the rental contracts.  Under Kentucky law, however, Mahan is bound to these rental agreements because they were made by employees who were acting within their apparent authority. Consequently, Sunbelt is entitled to summary judgment on its contractual indemnity claim.  Moreover, because the Contract at issue is valid, Mahan has released Sunbelt from all other claims or losses arising from the use of the rental equipment or the breach of the rental agreement.   Therefore, Mahan's counterclaims must be dismissed as a matter of law.

Respectfully submitted,

SCHILLER OSBOURN BARNES & MALONEY, PLLC

*/s/ Stephen C. Keller*

_____
Michael S. Maloney
Stephen C. Keller
401 W. Main Street, Suite 1600
Louisville, KY 40202
PH: (502) 583-4777
Fax: (502) 583-4780
mmaloney@sobmlegal.com
skeller@sobmlegal.com
*Counsel for Defendant,*
*Sunbelt Rentals, Inc.*