UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| LEON D. PRUITT and REBECCA PRUITT, | ) ) ) | |
| Plaintiffs, | ) ) | |
| V. | ) ) | |
| GENIE INDUSTRIES, INC., and SUNBELT RENTALS, INC., | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SUNBELT RENTALS, INC., | ) ) | Civil Action No. 3: 10-81-DCR |
| Third Party Plaintiff, | ) ) | |
| V. | ) ) | |
| C.J. MAHAN CONSTRUCTION COMPANY, LLC, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Third Party Defendants. | ) ) | |
| and | ) ) | |
| ZURICH AMERICAN INSURANCE CO., | ) ) | |
| Intervening Plaintiff, | ) ) | |
| V. | ) ) | |
| GENIE INDUSTRIES, INC., and SUNBELT RENTALS, INC., | ) ) ) | |
| Intervening Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

-1-

This matter is pending for consideration of the parties' various motions for summary judgment. [Record Nos. 159, 160, 161, 163] Sunbelt Rentals, Inc. ("Sunbelt") seeks summary judgment on its claim for contractual indemnity from C.J. Mahan Construction Company, LLC ("Mahan"). [Record No. 163] Conversely, Mahan asserts that it is entitled to judgment as a matter of law on Sunbelt's indemnity claim. [Record No. 159] And Sunbelt and Mahan both seek summary judgment on Mahan's counterclaim for declaratory judgment. [Record Nos. 159, 161] Sunbelt also moves for summary judgment on Mahan's other counterclaims. [Record No. 161] Finally, Sunbelt and Genie Industries, Inc. ("Genie") contend that they are entitled to summary judgment on Intervening Plaintiff Zurich American Insurance Company's ("Zurich") subrogation claim. [Record No. 160]

For the reasons explained below, the Court will grant Mahan's motion. Sunbelt's motion for summary judgment on Mahan's counterclaims will be granted, in part, but its motion for summary judgment on the indemnity claim against Mahan will be denied. Finally, the Court will grant Genie's and Sunbelt's joint motion for summary judgment.

## I.    Background

### A.    Relevant Facts

This case arises from an injury sustained by Leon D. Pruitt on April 22, 2010, during his employment with Mahan. Pruitt was injured while operating an aerial lift that was manufactured by Genie and sold to Sunbelt, a construction equipment rental company. Sunbelt, in turn, rented the lift to Mahan for use in a construction project. Mahan has rented equipment from Sunbelt on a number of occasions, both before and after the rental at issue in this case. [Record No. 163-

20, pp. 1-2 (documenting rental period beginning October 16, 2007), 18-19 (documenting rental period beginning September 17, 2010)]

On August 13, 2009, Mahan employee Jeff Pieper contacted Sunbelt to rent an 80-foot boom lift for use in a bridge construction project in Gratz, Kentucky. Pieper, the construction supervisor for the project, specifically requested a Genie S-80 lift. On August 14, 2009, Sunbelt employee Gary Travis delivered a Genie Manlift 4WD DSL, Model S-80D (hereinafter the "aerial lift") to the construction site. [Record No. 172, p. 2] Travis unloaded the aerial lift and then spoke with Kevin Lape, a carpenter temporarily employed by Mahan. Although the parties differ regarding the extent of Travis and Lape's conversation, it is undisputed that Lape "told Travis he was employed by Mahan and could sign for [the equipment]." [Record No. 163-1, p. 3] Lape printed and signed his name on the "Rental Out" form provided by Travis. Lape then gave a copy of the document to Pieper, who mailed it to Mahan's corporate office, as was his practice. [Record No. 161-2, pp. 37-38]

The Rental Out Receipt consists of two numbered pages. [Record No. 172-6] Printed on the first page are the details of the rental: the job site location, customer name, rental dates, description of the rental equipment, and estimated prices. The second numbered page has a customer signature line on the bottom, on which Lape affixed his signature. Directly above Lape's signature are eight numbered lines. The sixth states: "6. Customer has received, read, understands, and agrees to the estimated charges herein and all the terms and conditions of this Contract, including the Release and Indemnification provision in Section 8." [Record No. 172-6,

p. 2]   The last numbered item above the signature line begins: "8. For operations in California. . ." [*Id.*]

The back of each page is titled "ADDITIONAL TERMS AND CONDITIONS" and contains two columns of fine print, in paragraphs numbered 1 through 20.  [Record No. 172-2] The eighth paragraph reads as follows:

> 8.      RELEASE AND INDEMNIFICATION.  TO THE FULLEST EXTENT PERMITTED BY LAW, CUSTOMER INDEMNIFIES, RELEASES, HOLDS SUNBELT HARMLESS AND AT SUNBELT'S REQUEST, DEFENDS (WITH COUNSEL, APPROVED BY SUNBELT) FROM AND AGAINST ALL LIABILITIES, CLAIMS, LOSSES, DAMAGES, AND EXPENSES (INCLUDING ATTORNEY'S FEES AND EXPENSES) HOWEVER ARISING OR INCURRED, RELATED TO ANY INCIDENT, ANY DAMAGE TO PROPERTY, INJURY TO, OR DEATH OF, ANY PERSON OR ANY CONTAMINATION OR ALLEGED CONTAMINATION, OR VIOLATION OF LAW OR REGULATION CAUSED BY OR CONNECTED WITH THE USE, POSSESSION OR CONTROL OF THE EQUIPMENT DURING THE RENTAL PERIOD OR BREACH OF THIS CONTRACT, WHETHER OR NOT CAUSED BY THE ACTIVE OR PASSIVE NEGLIGENCE OR OTHER FAULT OF ANY PARTY INDEMNIFIED HEREIN AND ANY OF THE FOREGOING ARISING OR IMPOSED IN ACCORDANCE WITH THE DOCTRINE OF STRICT OR ABSOLUTE LIABILITY.  CUSTOMER'S INDEMNITY OBLIGATIONS SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THIS CONTRACT.  IF ANY PART OF THIS SECTION IS DETERMINED INVALID BY A COURT OF COMPETENT JURISDICTION, CUSTOMER AGREES THAT THIS RELEASE AND INDEMNIFICATION SHALL BE ENFORCEABLE TO THE FULLEST EXTENT PERMITTED BY LAW.

[Record No. 172-9]  Section 9 requires the customer to purchase general liability insurance, which must name Sunbelt as an additional insured and have a limit of at least $1 million.  [*Id.*]

Mahan maintains a Workers' Compensation Insurance Benefits policy with Zurich.  After the April 22, 2010 incident, Zurich paid workers' compensation benefits to Pruitt pursuant to the Kentucky Workers' Compensation Act.  Although Sunbelt and Genie maintain that Zurich has

-4-

paid total benefits of $109,466.96 [Record No. 160, p. 3], Zurich alleges that, as of May 2, 2012, it has paid "approximately $132,978.39 in medical expenses and related costs to or on behalf of Pruitt" in addition to $66,196.47 for Temporary Total Disability benefits. [Record No. 173, p. 2; *see also* Record Nos. 173-2, 173-3]

### B.   Procedural History

Pruitt and his wife Rebecca filed a products liability suit against Genie and Sunbelt on December 15, 2010. [Record No. 1] On June 1, 2011, Sunbelt filed a third-party complaint, asserting a claim for indemnity against Mahan. [Record No. 23] On November 7, 2011, the Court permitted Mahan to file an amended answer, in which Mahan asserted counterclaims and crossclaims against Sunbelt and Genie.[1] [Record No. 43] Mahan seeks a declaratory judgment that it does not have a contract with Sunbelt; therefore, it argues that Sunbelt is not entitled to indemnity. [Record No. 43, p. 11] Mahan also asserts claims for wrongful use of civil litigation and subrogation against Sunbelt. [*Id.*, pp. 14-15]

On January 18, 2012, Zurich was granted leave to file an Intervening Complaint. [Record No. 52] Zurich asserts that it is "subrogated to the extent of any [and] all benefits it has paid to or on behalf of Leon Pruitt" Genie and Sunbelt. [*Id.* ¶ 6] It seeks reimbursement for the payments it has made pursuant to its policy with Mahan and the Kentucky Workers' Compensation Act.

The Pruitts settled their underlying claims against Genie and Sunbelt in August 2012. [Record Nos. 150, 153] On July 12, 2012, the Court entered an amended scheduling order to

---

1       On January 10, 2013, the Court granted Genie's motion for judgment on the pleadings, dismissing all of Mahan's crossclaims against Genie except for the claim for subrogation. [Record No. 181]

address the remaining third-party claims, crossclaims, and counterclaims. [Record No. 145] The parties were directed to "file dispositive motions regarding the contract enforceability issue between Sunbelt and Mahan" by October 3, 3012. [*Id.*, p. 2] On October 1, 2012, Mahan moved for summary judgment on the claims against it as well as its own counterclaim for declaratory judgment. [Record No. 159] Sunbelt moved for summary judgment on Mahan's counterclaims and on its own indemnity claim on October 3, 2012.[2] [Record Nos. 161, 163] Additionally, on October 3, 2012, Genie and Sunbelt filed a joint motion for summary judgment on Zurich's claim for subrogation. [Record No. 160]

## II.   Standard of Review

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

---

2    Mahan contends that Sunbelt's motion for summary judgment on its counterclaims for wrongful use of civil proceedings and subrogation should be stricken for failure to comply with the Court's July 12, 2012 Order. The Order directed the parties to file dispositive motions "regarding the contract enforceability issue between Sunbelt and Mahan" by October 3, 2012. [Record No. 145, p. 2] However, Sunbelt correctly points out that the Order did not "prohibit the parties from filing dispositive motions on other issues." [Record No. 177, p. 3] Therefore, the Court will consider Sunbelt's arguments regarding Mahan's counterclaims.

A party moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists.  *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, the nonmoving party must present "significant probative evidence" of a genuine dispute in order to defeat the motion for summary judgment.  *Chao*, 285 F.3d at 424.  The nonmoving party cannot rely upon the assertions in its pleadings; rather, it must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324.  In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587.

## III.   Indemnity

Mahan seeks summary judgment on Sunbelt's indemnity claim, as well as its own counterclaim for declaratory judgment.  [Record No. 159]  It asserts that there is no enforceable contract between the two parties.  Alternatively, it argues that the indemnity provision is void. Sunbelt counters that the Rental Out Receipt constitutes a binding contract, that the indemnity provision is properly incorporated into the agreement, and that the provision does not violate Kentucky law.  Thus, Sunbelt contends that it is entitled to summary judgment on its claim for indemnity against Mahan.  [Record No. 163]  Additionally, Sunbelt seeks summary judgment on Mahan's counterclaim for declaratory judgment.  [Record No. 161]

-7-

### A.     Authority to Contract

Mahan contends that the alleged contract is unenforceable because its employee, Kevin Lape, had no authority to enter into a contact on Mahan's behalf.  *See* KRS § 355.2-201(1)(b) (requiring a lease contract to be "signed by the party against whom enforcement is sought or by that party's authorized agent" to be enforceable).  Sunbelt counters that Lape had implied actual authority to contractually bind Mahan.  Alternatively, it asserts that Lape had apparent authority due to the course of conduct between the parties.  Sunbelt, as the party "alleging agency and resulting authority[,] has the burden of proving that it exists."  *Mill Street Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990).  Under Kentucky law, "agency may be proved by circumstantial evidence and may be implied from the acts and conduct of the parties."  *Lacy v. Hodgkin*, 122 S.W.2d 768, 771 (Ky. 1938).

Sunbelt asserts that Lape had the implied authority to form execute the rental contract because he had the express, actual authority to sign for receipt of equipment.  "Implied authority is actual authority circumstantially proven which the principal actually intended the agent to possess and includes such powers as are practically necessary to carry out the duties actually delegated."  *Mill Street Church of Christ*, 785 S.W.2d at 267.  Sunbelt maintains that "employees of a construction company who have been given the express authority to sign for delivery of rental equipment to the site where they are working also have the implied authority to sign rental contracts governing the equipment being delivered there."  [Record No. 177, p. 4]  Sunbelt urges the Court to consider *Houston Exploration Co. v. Halliburten Energy Servs., Inc.*, 359 F.3d 777 (5th Cir. 2004), as persuasive authority in support of its position that Lape had the implied

-8-

authority to bind Mahan to the contract in question.  In *Houston Exploration*, the plaintiff's employee, Hileman, signed a work order agreement that included an indemnity provision.  *Id.* at 780.  Because the company had "approved and paid hundreds of similar work orders without objection" and because most of those work orders were "signed by company men," the United States Court of Appeals for the Fifth Circuit found that "Hileman's express authority to enter into the work order agreements necessarily included the implied authority to consent to the release and indemnity provision."  *Id.* at 781.

Here, Mahan does not dispute Sunbelt's assertion that Lape had the express actual authority to sign the Rental Out form, at least inasmuch as he "intended only to acknowledge that Sunbelt had dropped off the [aerial lift] at the construction site."  [Record No. 159-1, p. 3; *see* Record No. 163-14, pp. 4-5 ("[Lape] was taking receipt of a lift, and that's why he signed his name.")][3]  However, unlike in *Houston Exploration*, Mahan does not concede that Lape "had authority to sign . . . to engage [Sunbelt's] services."  359 F.3d at 779.  Lape was not authorized to arrange a rental from Sunbelt; that authority was retained by the site supervisor, Pieper.  [Record No. 161-2, p. 38; *see* Record No. 163-14, p. 9]  Thus, the type of actual authority at issue in this matter differs from *Houston Exploration*.  And, although arranging for the rental of equipment might imply the authority to agree to contractual terms concerning that rental, the mere authority to acknowledge receipt of that equipment does not.

---

3       Hope Matheny, the designated corporate representative for Mahan, testified that "it depends on the project who's designated" to sign for delivery of equipment.  [Record No. 163-14, p. 6]  She deferred to Pieper, as supervisor of the bridge project, to say who was designated to accept receipt of the rental equipment for that project.  Pieper testified that any Mahan employee can sign for a piece of equipment if they are out in the field.  [Record No. 161-2, p. 18]

Implied agency exists where an agent's acts are "necessary and incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.'" *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 592 (Ky. 2012) (quoting Restatement (Third) of Agency § 2.02(1) (2006)).  Sunbelt has failed to demonstrate that Lape's authority to bind his employer to the contract was incidental, much less necessary, to the act of acknowledging receipt of equipment.  Therefore, the Court concludes that Lape did not have actual implied authority to sign the contract on behalf of Mahan.

Sunbelt argues that even if Lape did not have the implied authority to contract with Sunbelt, he had the apparent authority to do so.  "An agent is said to have apparent authority to enter transactions on his or her principal's behalf with a third party when the principal has manifested to the third party that the agent is so authorized, and the third party reasonably relies on that manifestation." *Id.* at 594.  This inquiry hinges on the actions of the principal.  Apparent agency only arises if the principal "affirmatively hold[s] the agent out to the public as possessing sufficient authority" or permits the agent to behave as if he had such authority. *Savannah Sugar Refinery v. RC Canada Dry Bottling Co.*, 593 S.W.2d 880, 883 (Ky. Ct. App. 1979).

Under the facts presented, there is a genuine issue of material fact concerning the existence and scope of Lape's alleged apparent authority.  "It is usually a question for the trier of fact whether a reasonable person in the position of a third party would believe that an agent had the authority or the right to do a particular act."  Restatement (Third) of Agency § 2.03 cmt. d.  It is also a question of fact "whether such a belief is traceable to a manifestation of the

-10-

principal." *Id.*  Both Mahan and Sunbelt have presented "significant probative evidence" of a genuine dispute regarding the apparent authority of Lape to sign a contract on Mahan's behalf. *Chao*, 285 F.3d at 424.  Therefore, summary judgment is not appropriate regarding this issue.

## B.    Estoppel

Sunbelt also asserts that, even if Lape lacked the requisite authority to enter into the contract, Mahan should be equitably estopped from denying the existence of the agreement.  A "principal may be estopped from disavowing an agent's unauthorized transaction with a third party only if the third party justifiably was induced to make a detrimental change in position because it believed the agent had authority and then only if '(1) the [principal] intentionally or carelessly caused such belief, or (2) having notice of such belief and that it might induce others to change their positions, the [principal] did not take reasonable steps to notify them of the facts.'"  *Ping*, 376 S.W.3d at 595 (quoting Restatement (Third) of Agency § 2.05 (2006)) (alterations in original).  Under this analysis, the "operative question is whether a reasonable person in the position of the third party would believe such an agent, as the actor appears to be, to have authority to do a particular act."[4]  Restatement (Third) of Agency § 2.05 cmt. c.

Mahan concedes that "[t]hroughout the course of [its] rentals from Sunbelt, the equipment was never signed for by a Mahan employee having contracting authority."  [Record No. 172, p. 15]  Despite this, it asserts that Sunbelt cannot have reasonably believed that Lape had authority to enter into contracts on Mahan's behalf because having him sign the Rental Out

---

[4]    Estoppel "does not require as close a fit between affirmative acts of the principal and the third party's belief" as is required for a finding of apparent agency.  Restatement (Third) of Agency § 2.05 cmt. d. "Instead, it protects third parties who reasonably believe an actor to be authorized as an agent when the belief cannot be shown to follow directly or indirectly from the principal's own manifestations."  *Id.*

Receipt was against Sunbelt's own policy.  In her deposition, Amber Gobert, the manager of the Sunbelt location that supplied the aerial lift to Mahan, answered affirmatively to the question: "it is the policy and procedure of Sunbelt to find someone with decision making authority on behalf of the company, corporation or customer?"  [Record No. 172-1, p. 11]  Yet she later engaged in the following exchange:

> Q.     Why do you want to have somebody that's the site contact or the person ordering sign for the document?
>
> A.     Because they are with C.J. Mahan, they're the company that ordered or rented the lift.  So, therefore, if you're having them sign the contract, they need to be with that company.
>
> Q.     Would it be a fair way to say it, that the person would be authorized to enter into the contract,  . . . that would be your understanding? . . .
>
> A.     Yes.

[*Id.*, p. 12]

It is not clear from Gobert's testimony that Sunbelt had an established policy of securing an actual authorized agent to sign its contracts.  Gobert stated in her own words that it is Sunbelt's policy to have a person who is affiliated with or employed by Mahan sign the Rental Out Receipt.  She expressed her assumption that the reason for this rule is to ensure that the person signing has authority to enter into a contract.  However, the Sunbelt policy, as revealed through this testimony, is that the Sunbelt driver who delivers the equipment should have a Mahan employee sign the proper documentation, not that the driver must obtain the signature of an authorized agent of the company.  This conclusion is supported by the testimony of Gary Travis, the driver who delivered the aerial lift to Mahan on August 14, 2009.  Travis testified

that, upon delivery, he is required by Sunbelt to find "somebody that's working for the company that's renting [the equipment], [as] generally they are the ones who can sign [the Rental Out Receipt]."  [Record No. 163-10, p. 5]

However, even if Travis had ensured that Pieper, in his capacity as supervisor, signed the Rental Out Receipt, Mahan would not consider the resulting document to be an enforceable contract.  Hope Matheny, the designated corporate representative for Mahan, testified that Mahan's "officers or corporate counsel are the only persons authorized to" bind the company to contracts.  [Record No. 163-1, p. 9 (citing Record No. 163-14, p. 30)]  Yet Mahan did not — at any point — inform Sunbelt that these were the only agents authorized to contract with third parties.  [Record No. 163-14, p. 30][5]  In short, no Mahan employee on any given construction site is authorized under Mahan policy to enter into a contract.  Thus, Travis would have been unable to obtain the signature of an authorized agent on August 14, 2009, even if he had specifically asked for one.

According to the undisputed facts presented by the parties, Sunbelt had a reasonable basis to believe that Lape's signature was sufficient to form a valid contract.  The course of conduct between the parties also supports a conclusion that Mahan caused that belief.  Estoppel may "arise in close proximity to circumstances that establish that the principal has ratified the agent's acts."  Restatement (Third) of Agency § 2.05 cmt. d.  And a principal may ratify the acts of an

---

[5]     Mahan's reasoning on this point is circular.  Matheny testified that Mahan did not tell Sunbelt about its policy that any agreement must be approved by corporate counsel or officers to be binding because Mahan "didn't feel the need to [explain this to Sunbelt] because there was no written agreement."  [Record No. 163-14, p. 30]  Therefore, it is apparently Mahan's position that it must only explain its procedures for entering into an enforceable agreement to a person or entity with whom it is already in contract.

agent through "conduct that justifies a reasonable assumption that the [principal] so consents." *Id.* § 4.01(2)(b); *see id.* cmt. d ("For example, knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction."). Here, the circumstances create a reasonable inference that Mahan consented to the formation of a contract.

For several years, Sunbelt rented construction equipment to Mahan. Each instance involved a form that was virtually identical to the one at issue in this case, including the Release and Indemnification provision on the back page. [*See* Record No. 163-16, pp. 19-23; Record No. 163-19, pp. 12-32; Record No. 163-20, pp. 1-25] Upon delivery, a Mahan employee would sign the form, which contained language referring to the document as a Contract. [*See* Record No. 172-6] Mahan then used the equipment and paid Sunbelt for that use.[6] [*See, e.g.*, Record No. 163-16, p. 21 (confirming that Mahan paid Sunbelt for the rental of two air hammers, an air hammer chisel, and a discharge hose)] During this time, Mahan never objected to the existence of any contract on the grounds that the employee who signed the document had no authority to do so.

Mahan also included Sunbelt as an additional insured on Mahan's general liability policy. [Record No. 163-14, p. 45 (Schedule of Certificate Holders); *see also id.*, pp. 18-22, 48] The policy provided "commercial general liability coverage, $1,000,000 per occurrence" in compliance with Section 9 of the Additional Terms and Conditions on the back page of the

---

6       The record contains four invoices for the aerial lift at issue in this case. Each was approved by three Mahan employees, including Malcolm White, Vice President of Operations [Record No. 163-14, pp. 65-68; *see id.*, p. 26] The invoices include a box titled "CONTRACT NO.," in which the number is printed the number 21800532. [*Id.*, p. 65] This is the same number that is identified on the Rental Out Receipt as the "Contract #." [*See* Record No. 172-6]

Rental Out Receipt.  [*Id.*, p. 21; *see* Record No. 172-9]  Further, the certificate of insurance contains a cancellation provision that directs the insurer to give 30 days written notice to Sunbelt Rentals, also in keeping with Section 9.  [Record No. 163-14, p. 46; *see* Record No. 172-9 ("Such policies shall . . . provide for Sunbelt the receive at least 30 days prior written notice of any cancellation or material change in such coverage.")]

These facts are "sufficient to create 'reasonable reliance'" on the part of Sunbelt. *Howard v. Motorists Mut. Ins. Co.*, 955 S.W.2d 525, 532 (Ky. 1997).  By acting in conformance with Sunbelt's belief that a contract had been formed by the signatures of other Mahan employees during each rental prior to the August 14, 2009 rental, Mahan at least "carelessly" caused Sunbelt to believe that Lape's signature was sufficient to bind Mahan to the contractual terms contained in the Rental Out Receipt.[7]  *Ping*, 376 S.W.3d at 595.  Sunbelt detrimentally changed its position on the basis of that belief by continuing to conduct business with Mahan without the protection of its usual contractual terms.  Therefore, Mahan is estopped to deny the existence of the contract with Sunbelt.

---

[7]    Sunbelt also maintains that Mahan "had to know that Sunbelt believed that Mahan's employees who signed the rental agreements were authorized to do so."  [Record No. 163-1, p. 13]  Because the Court finds that Mahan caused Sunbelt's reasonable belief in the existence of an agency relationship between Mahan and Lape, it need not consider whether Mahan knew about Sunbelt's belief and failed to correct the misapprehension.  *See* Restatement (Third) Agency § 2.05 (explaining that a principal is liable if it "(1) intentionally or carelessly caused such belief, *or* (2) having notice of such belief . . . did not take reasonable steps to notify them of the facts" (emphasis added)).  However, Mahan's contention that it was unaware of Sunbelt's belief is not persuasive.  Sunbelt is a corporation that rents expensive and dangerous equipment to construction companies.  It is not reasonable for Mahan to believe that Sunbelt would continue to do business with a customer that disavows its contracts.  This is especially true since Mahan was in possession of a number of documents from Sunbelt that contained language identifying the instruments as contracts.  Therefore, in addition to causing Sunbelt's justifiable belief that Lape was authorized to bind Mahan to contractual terms, Mahan "failed to correct [Sunbelt's] misapprehension after having notice of it."  *Ping*, 376 S.W.3d at 595.

### C.    Incorporation of Terms

Mahan argues that the Release and Indemnity provision contained on the Additional Terms and Conditions page of the Rental Out Receipt is not a valid provision of the contract formed between the parties.  Mahan contends that because the page is unnumbered and unsigned, the terms contained on that page are not part of the contract.  In Kentucky, a contract is not considered to be "signed unless the signature is subscribed at the end or close of the writing." KRS § 446.060.  Sunbelt argues that, "in a literal sense, the indemnity clause appeared before Lape's signature — on the back of the first page." [Record No. 163-1, p. 14]  However, the page containing the Additional Terms and Conditions is not numbered, whereas the front of the Rental Out Receipt are numbered "Page 1 of 2" and "Page 2 of 2." [Record No. 172-6]  Thus, this argument is unpersuasive.

Despite the signature requirement codified in KRS § 446.060, Kentucky law recognizes the doctrine of incorporation by reference.  *Bartelt Aviation, Inc. v. Dry Lake Coal Co., Inc.*, 682 S.W.2d 796, 797 (Ky. Ct. App. 1985) ("This statute did not abolish the doctrine of incorporation by reference.").  Thus, "when a signature is placed after clear language has expressed the incorporation of other terms and conditions by reference, it is a logical inference that the signer agrees to be bound by everything incorporated."  *Id.*

Mahan contends that the "incorporating language must 'be conspicuous by being in larger or other contrasting type or color.'"  [Record No. 159-1, p. 10 (quoting *Hertz Commercial Leasing Corp. v. Joseph*, 641 S.W.2d 753, 756 (Ky. Ct. App. 1982))]  Sunbelt, on the other hand, asserts that "the only requirement is that the incorporating language be plain and clear such that

a reasonable person would have been aware of the language to be incorporated under the circumstances."  [Record No. 163-1, p. 14 (citing *Home Lumber Co. v. Appalachian Reg'l Hosps., Inc.*, 722 S.W.2d 912, 915 (Ky. Ct. App. 1987))]  The Sixth Circuit has explained that "when the incorporating language is above a contractor's signature, 'we know of no case law or statutes which require that the incorporation language for the arbitration provision be stated in bold type or in any unusual form.'"  *Thompson v. The Budd Co.*, 199 F.3d 799, 810 (6th Cir. 1999) (quoting *Bartelt Aviation*, 682 S.W.2d at 798) (noting that "[a]lthough the issue in this case is an indemnity provision as opposed to an arbitration provision [as in *Bartlett*], the distinction is immaterial").

Here, the incorporation language is the statement that "Customer has received, read, understands and agrees to . . . all the terms and conditions of this Contract, including the Release and Indemnification provision in Section 8."  [Record No. 172-6]  There is no language above the signature that specifically directs the reader to the reverse side of the Rental Out Receipt.  [Record No. 159-1, pp. 11-12]  As Mahan points out, the "average person reads section 6 and goes to section 8 above Kevin Lape's signature."  [Record No. 159-1, p. 6]

However, the analysis does not end there.  The section 8 that appears above the signature line does not contain any terms regarding "Release and Indemnification."  [Record No. 172-6]  Thus, it is not clear that a reasonable person would assume that this is the "Section 8" referenced in the sixth paragraph above the signature line and look no further.  While language specifically referring to the reverse side of the Rental Out Receipt would have been a more clear statement of incorporation, it is not required for a finding that terms have been incorporated.  *See, e.g.*,

-17-

*Daymar Colls. Grp., LLC v. Dixon*, No. 2010-CA-002039-MR, 2012 WL 4335393, at *2 (Ky. Ct. App. Sept. 21, 2012) (finding incorporation where the language above the signature does not state that terms appear on the back page but signor was required to acknowledge that he read both pages of the document). Because the Additional Terms and Conditions are "clearly visible on the reverse side[s]" of both pages of the Rental Out Receipt, it is entirely possible that it would occur to a reasonable person to look for the Release and Indemnification provision on the back page of the Rental Out Receipt. *Bartelt Aviation*, 682 S.W.2d at 798.

In short, neither Mahan or Sunbelt has met its burden on this issue. Therefore, there is a genuine issue of material fact whether the incorporating language — *i.e.*, the phrase "including the Release and Indemnification provision" [Record No. 172-6, p. 2] — is plain and clear enough to direct a reasonable person to numbered paragraph 8 on the back page. However, it is not necessary to submit the question to a jury because, even if it is properly incorporated into the contract, the Release and Indemnification provision is unenforceable as a matter of law.

### D.    KRS § 371.180

Mahan asserts that any indemnity provision contained in the contract with Sunbelt is invalid under Kentucky law. In 2005, the Kentucky General Assembly "enacted an anti-indemnification provision related to construction services contracts." John E. Sebastian, *Recent Legislation Affecting the Construction Industry*, 26 CONSTRUCTION LAW. 39, 40 (2006). The statute provides that "[a]ny provision contained in any construction services contract purporting to indemnify or hold harmless a contractor from that contractor's own negligence or from the

-18-

negligence of his or her agents, or employees is void and wholly unenforceable."   KRS § 371.180(2).  A construction services contract is defined as follows:

> 1.      A contract or agreement relating to the construction, alteration, repair, addition to, subtraction from, improvement to, or maintenance of any building, highway, road, railroad, excavation, or other structure, project, development, or improvement attached to real estate . . .; or
>
> 2.      A contract or agreement relating to the planning, design, administration, study, evaluation, consulting, or other professional and technical support services provided in connection with any of the work or activities described in subparagraph 1. of this paragraph.

KRS § 371.180(1)(a).

A "contractor" is "the person offering a contract for services provided."   KRS § 371.180(1)(b).  Therefore, Sunbelt is incorrect in asserting that it is not a contractor under the statute simply because it is not "an entity providing 'construction services.'" [Record No. 163-1, p. 17]  Sunbelt is a contractor for the purposes of § 371.180(2) because it has offered Mahan a contract for services, specifically the rental of construction equipment.

As Mahan points out, there is no binding authority regarding the proper interpretation of KRS § 371.180.   However, Tennessee has a "similar, but not identical, statute[] on the enforceability of indemnification provisions in construction contracts."  *Asher v. Unarco Material Handling, Inc.*, No. 06-548-ART, 2011 WL 3104084, at *2 (E.D. Ky. July 26, 2011). The Tennessee statute provides that any indemnification clause in a contract made "relative to" construction activities is void and unenforceable.[8]  Tenn. Code Ann. § 62-6-123.  The Tennessee

---

8       The Tennessee statute provides:

> A covenant promise, agreement or understanding in or in connection with or collateral to a contract or agreement *relative to* the construction, alteration, repair or maintenance of a

Court of Appeals has interpreted this statute to apply to agreements regarding the rental of a crane for use in a construction project. *Elliott Crane Serv., Inc. v. H.G. Hill Stores, Inc.*, 840 S.W.2d 376, 379-80 (Tenn. Ct. App. 1992) (explaining that even though the rental company was not itself engaged in construction work, the contract was "relative to" the construction project).

This Court concludes that the contract between Sunbelt and Mahan fits within the definition of a construction services contract under KRS § 371.180. Although Sunbelt is correct that the agreement does not contemplate "the performance of construction services," it does relate to the construction of a structure — namely, a bridge. [Record No. 163-1, p. 17] The Rental Out Receipt "specifically recited on its face the name of the construction project, its location, and its job number." [Record No. 172, p. 26] Thus, the contract relates to technical support services provided in connection with a construction project. Because the Kentucky statute in question is nearly identical to the Tennessee statute in its expansive language, this conclusion is supported by the holding in *Elliott Crane Service*. Therefore, the indemnity provision contained in the Rental Out Receipt violates KRS § 371.180, and it is unenforceable.[9]

---

building, structure, appurtenance and appliance, including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, the promisee's agents or employees or indemnitee, is against public policy and is void and unenforceable.

Tenn. Code Ann. § 62-6-123 (emphasis added). Contrary to Sunbelt's assertion, the operative phrase for determining the scope of this statute is "relative to," and not "in connection with or collateral to." The former describes the relationship of the contract with the construction activities, whereas the latter describes the connection between the indemnity provision and the contract. However, even if the Tennessee statute applied to contracts made "in connection with or collateral to" construction services, the Court would not agree that the difference is enough to find that the Tennessee statute "differs markedly" from KRS § 371.180. [Record No. 171, p. 9]

9      Because the indemnity provision is void under KRS § 371.180, it is not necessary to address Mahan's argument that the provision violates KRS § 342.690. However, this argument would be unsuccessful. The

As a result, Mahan is entitled to judgment as a matter of law on its claim for a declaratory judgment.

### IV.    Wrongful Use of Civil Proceedings

Sunbelt also seeks summary judgment on Count Three of Mahan's Cross and Counter Complaint, which alleges that Sunbelt acted "primarily for a purpose other than securing the proper adjudication of the claim it states" when it joined Mahan as a third-party defendant. [Record No. 43, p. 14]  Kentucky law recognizes a cause of action for the wrongful use of civil proceedings.  *Mapother & Mapother, P.S.C. v. Douglas*, 750 S.W.2d 430, 431 (Ky. 1988) (adopting Chapter 30 of the Restatement (Second) of Torts (1977)).  Such a claim "requires that in the prior lawsuit the tortfeasor acted 'without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the [prior] claim.'"  *Prewitt v. Sexton*, 777 S.W.2d 891, 894 (Ky. 1989) (quoting Restatement (Second) of Torts § 674); *see Bates v. Curtis*, No. 2010-CA-000285-MR, 2012 WL 3538271, at *3 (Ky. Ct. App. Aug. 17, 2012) (distinguishing "wrongful use" claims from claims for malicious prosecution, which apply only in criminal cases).  The plaintiff must demonstrate the following elements to make out a claim for wrongful use of civil proceedings:

> (1) the institution or continuation of original judicial proceedings, . . . (2) by, or at the instance, of the plaintiff, (3) the termination of such proceedings in

Supreme Court of Kentucky has held that KRS § 342.690(1) "limits an employer's liability to indemnify a third-party tortfeasor to the amount of workers' compensation benefits that the employer must pay . . . unless the parties have contracted otherwise." *Labor Ready, Inc. v. Johnston*, 289 S.W.3d 200, 208 (Ky. 2009). In doing so, the court noted that it was "not convinced that a contractual indemnity provision must be viewed as being abhorrent to" the Workers' Compensation Act. *Id.* Mahan's argument that "contractual indemnity can only flow one way, e.g., employer and third-party tortfeasor can agree that the third-party tortfeasor will indemnify the employer" [Record No. 159-1, p. 20], is a tortured reading of the *Labor Ready* decision and is not persuasive.

defendant's favor,[10] (4) malice in the institution of such proceeding, (5) want or lack of probable cause for the proceeding, and (6) the suffering of damage as a result of the proceeding.

*D'Angelo v. Mussler*, 290 S.W.3d 75, 79 (Ky. Ct. App. 2009).

Mahan contends that Sunbelt's motion for summary judgment on this counterclaim is not ripe for review.  A claim is not justiciable "when it is filed too early."  *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008).  "In ascertaining whether a claim is ripe for judicial resolution, we ask two basic questions: (1) is the claim 'fit[ ] . . . for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?"  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)) (alterations in original).  Here, because the Court has determined that Sunbelt is not entitled to indemnification from Mahan, the wrongful use claim is now ripe.  Additionally, both parties would experience hardship from the Court withholding consideration because it is in the interest of all parties to resolve the issues presented in the most efficient manner possible.  Therefore, the Court will address Sunbelt's motion for summary judgment on Mahan's counterclaim for wrongful use of civil proceedings.

Sunbelt asserts that "Mahan's claim for wrongful use of civil proceedings must be dismissed as a matter of law because Sunbelt had probable cause to assert those claims against Mahan."[11]  [Record No. 163-1, p. 19]  The Court has a "mandatory duty to determine the

---

10      The term "defendant" is used here to refer to the "person against whom [the underlying] civil proceedings are brought."  Restatement (Second) Torts § 674.  In other words, the underlying civil action must be resolved in favor of the party bringing the claim for wrongful use.

11      Sunbelt also points out that the third element cannot be met here because "the proceeding which Mahan accuses Sunbelt of improperly initiating obviously has not yet concluded."  [Record No. 163-1, p. 19]  However, it contends that it is entitled to summary judgment "regardless of the ultimate disposition of

existence of probable cause."  *Bates*, 2012 WL 3538271, at *4 ("Only after the trial court had

determined the existence of probable cause in this action should the matter have then been

submitted to the jury on whether the prior action was initiated for an improper purpose.").  The

term probable cause "covers both a mistake of law and a mistake of fact, and it exists where the

person who initiates civil proceedings 'reasonably believes in the existence of the facts upon

which the claim is based, and . . . that under those facts the claim may be valid under the

applicable law.'"  *Prewitt*, 777 S.W.2d at 894 (quoting Restatement (Second) of Torts § 675).

When evaluating the probable cause element of a wrongful use of civil proceedings claim, the

Court should keep in mind that the "quantum of necessary probable cause is less than that

required in a criminal action."  *D'Angelo*, 290 S.W.3d at 80 (explaining that "[i]n many cases

civil proceedings, to be effective, must be begun before all of the relevant facts can be

ascertained to a reasonable degree of certainty").

Sunbelt argues that it filed its third-party complaint against Mahan "to preserve Sunbelt's

right to seek to apportion fault against Mahan at a trial of the Pruitts' claims."  [Record No. 163-

1, p. 20]  It maintains that, as of June 2011 when the third-party complaint was filed, it possessed

the following information: (1) the Rental Out Receipt bearing the signature of Mahan's

employee Lape, "which contained insurance and indemnification requirements inuring to

Sunbelt's benefit"; (2) a certificate of insurance naming Sunbelt as an additional insured under

Mahan's general liability policy; and (3) "a letter from Zurich confirming that Sunbelt was an

insured under that policy because of the valid lease agreement between Sunbelt and Mahan."

---

Sunbelt's third-party claims."  [*Id.*]

[*Id.*]  Additionally, Sunbelt "reasonably believed that Mahan employees had prevented one of Sunbelt's employees from placing new warning decals on the subject lift shortly before Mr. Pruitt's accident."  [*Id.*, p. 22; *see* Record No. 163-21, p. 7 (testimony from Sunbelt employee John Giovenco that Mahan employees prevented him from installing new decals on the aerial lift)]  Based on these facts, the Court concludes that Sunbelt had probable cause to seek apportionment of fault from Mahan.  Therefore, the Court will grant Sunbelt's motion [Record No. 161] with respect to Mahan's counterclaim for wrongful use of civil proceedings.

### V.      Subrogation

Genie and Sunbelt seek summary judgment on Zurich's claim for subrogation of the benefits it has paid to or on behalf of Pruitt.  [Record No. 160]  They assert that "Zurich's subrogation interest is extinguished" under KRS § 342.700(1).  [*Id.*, p. 3]  Sunbelt has also moved for summary judgment on Mahan's counterclaim for subrogation based on the same arguments advanced in its joint motion with Genie.  [Record No. 163-1, p. 23]  Additionally, Sunbelt maintains that Mahan lacks standing to pursue its subrogation claim.

### A.      Zurich's Subrogation Claim

Kentucky law provides a right of subrogation for workers' compensation payments made where a third party is liable for the injury.  The statute provides:

> If compensation is awarded under this chapter, the employer, his insurance carrier, the special fund, and the uninsured employer's fund, or any of them, having paid the compensation or having become liable therefor, may recover in his or its own name or that of the injured employee from the other person in whom legal liability for damages exists, *not to exceed the indemnity paid and payable to the injured employee, less the employee's legal fees and expense.*

KRS § 342.700(1) (emphasis added).

-24-

The Supreme Court of Kentucky has explained that this statute "requires that the employee's entire legal expense, not just a pro rata share, be deducted from the employer's or insurer's portion of any recovery." *AIK Selective Self Ins. Fund v. Bush*, 74 S.W.3d 251, 257 (Ky. 2002). The court reiterated this point in *AIK Selective Self-Ins. Fund v. Minton*, 192 S.W.3d 415 (Ky. 2006), opining that the statute should be interpreted according to its "literal and plain meaning." *Id.* at 418. Additionally, the *Minton* court concluded that "it is reasonable for the legislature to deny employer/insurers an additional subrogation credit from the tort award unless the employer/insurer's subrogation claim is greater than the costs incurred to pursue the tort award." *Id.* at 419.

Genie and Sunbelt contend that Zurich is not entitled to subrogation under KRS § 342.700(1) because the Pruitts' attorneys' fees and costs exceeded the amount Zurich has paid in Workers' Compensation benefits. In support, Genie and Sunbelt have attached two affidavits by Todd M. Powers, counsel for the Pruitts, which state that "Plaintiffs' attorneys' fees and costs to resolve the above[-]styled lawsuit exceeded the amount of Zurich's Workers' Compensation lien." [Record No. 160-1 ¶ 4; *see* Record No. 176-2] Therefore, according to Genie and Sunbelt, the lien is extinguished and they are entitled to judgment as a matter of law.

Zurich responds that KRS § 342.700(1) does not limit its right of subrogation in this case.[12] It argues that this case can be distinguished from the facts of *Bush* and *Minton* because

---

12     Genie and Sunbelt request that the Court strike Zurich's response as untimely. [Record No. 176, p. 4 n.1] Under the Joint Local Rules of Civil Procedure, a "party opposing a motion must file a response memorandum within twenty-one (21) days of service of the motion." LR 7.1(c). Thus, Genie and Sunbelt are correct that Zurich's response was due on October 24, 2012. However, Rule 6(d) of the Federal Rules of Civil Procedure — which is not superseded or altered by the Joint Local Rules — adds three days to the response period for a party served with a written motion. Fed. R. Civ. P. 6(d). Therefore, Zurich's October 29, 2012 response was not untimely. *See* Fed. R. Civ. P. 6(a)(1)(C).

the opinions were "based on the premise that the party with the subrogation right, be it the employer or the workers' compensation insurer, is bearing no costs of risk associated with the Plaintiff's tort recovery."  [Record No. 173, p. 4]  Zurich contends that, because the Pruitts settled with Genie and Sunbelt, Zurich and Mahan have had to "bear the risk associated with continuing to litigate this action," and thus KRS § 342.700(1) does not apply.  [*Id.*, p. 5]  The Court finds this argument to be without merit.

In *Minton*, the injured employee collected workers' compensation benefits and then filed a tort action against a third party for his injuries.  192 S.W.3d at 417.  AIK, the insurance carrier, "intervened to exercise its subrogation claim," after which the underlying tort claim was settled. *Id.*  The Supreme Court of Kentucky upheld the trial court finding that AIK was not entitled to subrogation because the employee's legal fees exceeded the amount of workers' compensation benefits paid.  *Id.*  The facts of *Minton* do not differ in any significant way from the procedural posture of this case.  As a result, the Court rejects Zurich's argument that it is entitled to subrogation because it is incurring its own legal fees pursuing its subrogation claim.[13]

Zurich also asserts that "applying the holdings of *Minton* and *Bush* to the circumstances present herein to prohibit recover[y] is improper under the current facts because Pruitt was also making a claim for punitive damages."  [Record No. 173, p. 5]  However, the November 6, 2012 affidavit of Todd M. Powers specifically states that "[n]o portion of the settlement proceeds were

---

[13]     The Court also rejects Zurich's and Mahan's argument that KRS § 342.700(1) is unconstitutional. The Court is not at liberty to entertain this claim because it was not raised in the pleadings filed by either party.  *See Francis v. Marshall*, 684 F. Supp. 2d 897, 902 (noting that the summary judgment stage is "far too late" to assert a new claim).  Moreover, Kentucky courts have repeatedly rejected similar challenges to this provision, and this Court will not second-guess those decisions.  *See, e.g.*, *Minton*, 192 S.W.3d at 419 (rejecting arguments that KRS § 342.700(1) is "unreasonable, arbitrary or in violation of any of Appellant's rights under either the United States or the Kentucky Constitutions").

allocated to Plaintiffs' punitive damages claim." [Record No. 176-2 ¶ 6] Therefore, this argument is moot. But even if it were not moot, the argument would fail under *Minton*. In that case, the insurance carrier argued that the application of KRS § 342.700(1) was "unfair because a portion of [the] legal fees and expenses may be attributable to recovering tort damages (namely, pain and suffering) which are not duplicative of and are unrelated to the workers' compensation benefits." 192 S.W.3d at 417. The *Minton* court rejected this argument based on the plain language of the statute, holding that "cost of the injured worker's pursuit of a tort judgment [is regarded] as a whole and singular endeavor, not subject to apportionment based on the elements of damages actually awarded." *Id.* at 419. Therefore, KRS § 342.700(1) requires that the "entire costs of pursuing the tort award" be deducted from Zurich's lien. *Id.* at 418.

The exact amount of Zurich's workers' compensation lien is disputed. Genie and Sunbelt maintain that Zurich has paid "at least $109,466.96 to or for the benefits of Leon Pruitt." [Record No. 160, p. 3] However, Zurich asserts that it has "thus far paid at least $199,174.86." [Record No. 173, p. 3] It supports this figure with internal documentation of the payments made to Pruitt and his medical providers. [*See* Record Nos. 173-2, 173-3] Viewing the evidence in the light most favorable to Zurich as the nonmoving party, the Court will rely on the highest figure — $199,174.86 — for its analysis.[14] *See Matsushita*, 475 U.S. at 587.

Mahan contends that it "has a $100,000 deductible under its policy of Worker's Compensation insurance and must therefore pay the first $100,000 of Mr[.] Pruitt's Worker's

---

14      The Court will use this amount despite the discrepancy in Zurich's own evidence. Zurich submitted an affidavit by Jeff Davis, its Litigation Specialist, who calculates the total lien to be $181,723.72. [Record No. 173-4 ¶¶ 4-5 (stating that Zurich has paid $115,527.25 for medical treatment and $66,196.47 in disability payments)] The difference between the calculations would not affect the outcome of this motion.

Compensation claim out of pocket." [Record No. 172, p. 33]  Additionally, it states that "the total actual amount paid [to Pruitt for Workers' Compensation benefits] to date is in excess of $233,000."  [*Id.*, p. 34]  However, Mahan cites no evidence for either of these assertions. Because the Court "need consider only the cited materials," Fed. R. Civ. P. 56(c)(3), and because a review of the record reveals no evidence to support Mahan's factual allegations, the Court will consider Zurich's calculation of the Workers' Compensation lien to be an undisputed fact for the purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2).

Genie and Sunbelt have filed two affidavits by the Pruitts' counsel, Todd M. Powers.  In the first, Powers states that the Pruitts' expenses and attorneys' fees exceeded $109,466.96; the second asserts that the fees and costs exceeded $233,000.00.  [Record Nos. 160-1, 176-2] Relying on the latter affidavit, Genie and Sunbelt assert that even Zurich is correct in stating its lien as $199,174.86, the "attorney's fees and costs incurred by Plaintiffs exceed even the greater workers' compensation lien now asserted by Zurich and Mahan."  [Record No. 176, p. 5; *see* Record No. 176-2 ¶ 4]  Zurich argues that Powers has no "firsthand knowledge of the size of Zurich's subrogation claim."  [Record No. 173, p. 3]  However, he does have firsthand knowledge of the Pruitts' attorneys' fees and costs, and his affidavit establishes that those amounts, which exceeded $233,000, were greater than the total payments made by Zurich. Therefore, Zurich's subrogation lien is extinguished under KRS § 342.700(1).  The Court will grant Genie's and Sunbelt's motion.

### B.    Mahan's Subrogation Counterclaim

-28-

Finally, Sunbelt seeks summary judgment on Mahan's counterclaim for subrogation. [Record No. 161]  It argues that Mahan lacks standing to pursue this claim because "such compensation was provided by Mahan's insurer, Zurich, which has already intervened in this matter."  [Record No. 163-1, p. 23]  Sunbelt cites no statutory or other authority for this assertion.  Indeed, it cannot do so because the statutory provision in question explicitly states that if workers' compensation is awarded, "the employer, his insurance carrier, the special fund, *and* the uninsured employer's fund, *or any of them*, having paid the compensation . . . may recover in his or its own name . . . from the other person in whom legal liability for damages exists." KRS § 342.700(1) (emphasis added).  Based on a plain reading of the statute, Sunbelt's argument — that Mahan cannot seek subrogation because Zurich has already done so — is without merit. The Court rejects Sunbelt's argument that Mahan lacks standing to pursue its subrogation claim.

Sunbelt also contends that the right to subrogation is extinguished because "the Pruitts' attorney fees and costs in pursuing their claims against Sunbelt and Genie have exceeded the amount of Zurich's subrogation lien to date."  [Record No. 163-1, p. 23 (incorporating by reference the arguments set forth in Genie and Sunbelt's motion for summary judgment against Zurich)]  Mahan counters that it has paid workers' compensation benefits in the amount of $100,000 to Pruitt, and thus the amount of the total lien is greater than the other parties have alleged.  It asserts that the workers' compensation lien amounts to $233,000 in total.  [Record No. 172, p. 34]  However, for the reasons explained above, the Court finds that Mahan has failed to properly support these assertions of fact.[15]  *See* Fed. R. Civ. P. 56(e).  Regardless, Sunbelt has

---

15    Additionally, Mahan's Cross and Counter Complaint does not contain any factual allegations concerning its purported $100,000 deductible.  [*See* Record No. 43, p. 11 (claiming that Mahan "provided

submitted evidence that the Pruitts' attorney's fees and costs exceeded $233,000. [Record No. 176-2 ¶ 4]  Therefore, the Court concludes that Mahan's workers' compensation lien has been extinguished under KRS § 342.700(1).  Sunbelt is entitled to summary judgment on Mahan's counterclaim for subrogation.

### VI.      Conclusion

For the reasons discussed above, it is hereby

**ORDERED** as follows:

1.      C.J. Mahan Construction Company LLC's Motion for Summary Judgment [Record No. 159] is **GRANTED**.  Sunbelt Rentals, Inc.'s third-party indemnity claim against Mahan is **DISMISSED**, with prejudice.

2.      Genie Industries, Inc.'s and Sunbelt Rentals, Inc.'s Joint Motion for Summary Judgment [Record No. 160] is **GRANTED**. Zurich American Insurance Company's intervening claims against Genie and Sunbelt are **DISMISSED**, with prejudice.

3.      Sunbelt Rentals, Inc.'s Motion for Summary Judgment [Record No. 161] is **GRANTED** with respect to C.J. Mahan Construction Company, LLC's counterclaims for wrongful use of civil proceedings (Count Three) and subrogation (Count Four).  Mahan's counterclaims against Sunbelt for wrongful use of civil proceedings and subrogation are **DISMISSED**, with prejudice.  The motion is **DENIED** regarding Mahan's counterclaim for declaratory judgment (Count One).

-------

workers' compensation insurance coverage on its employees" and that it "became liable to pay benefits to or on behalf of" Pruitt when he was injured)]

-30-

4.      Sunbelt Rentals, Inc.'s Motion for Summary Judgment [Record No. 163] is

**DENIED**.

This 6th day of February, 2013.

Signed By:

_Danny C. Reeves_   DCR

**United States District Judge**